# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PETER J. EARLE,<br><br>    Appellant/Cross-Respondent,<br><br>        v.<br><br>SATPAL S. SIDHU (In his official capacity), ELIZABETH KOSA (In her official capacity), and WHATCOM COUNTY,<br><br>    Respondents/Cross-Appellants. | No. 87752-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — Lummi Island resident, Peter Earle, filed a lawsuit against Whatcom County, the Whatcom County Executive, and the Director of the Whatcom County Department of Public Works after the County announced fare increases for the Lummi Island ferry based on its determination that ferry revenue was insufficient to cover its required portion (55 percent) of the ferry's operating costs. Earle claimed the deficit was created because the County improperly designated as "operating costs" (1) monthly lease payments to the Lummi Island Nation (referred to herein as the "lease payments") and (2) repair costs for two components of the ferry dock infrastructure known as "dolphins" (referred to herein as the "dolphin expenses"). After a bench trial, the trial court ruled that the County appropriately included the lease payments as operating costs but the dolphin

expenses were not regular and routine maintenance and therefore were inappropriately categorized as operating costs. Accordingly, the court denied Earle's request for declaratory relief as to the lease payments, granted his request for declaratory relief as to the dolphin expenses, and enjoined the County from implementing fare increases until it subtracted $781,923.77 for the dolphin expenses and recalculated the resulting fare increase. Earle appeals from the trial court's ruling as to lease payments, and the County cross-appeals its ruling as to the dolphin expenses. Finding no error, we affirm both rulings.

I

Whatcom County purchased the Lummi Island ferry and two docking sites in 1924 and charges passengers to use the ferry. The applicable Whatcom County Code (WCC) provision that codified the framework for setting ferry rates established a "Fare Box Recovery Rate," defined as the "percentage of total revenue generated through Ferry User Fees in comparison to total Operating Costs." Former WWC 10.34.005(D) (2005).[1] The code also provided that ferry user fee revenue must be sufficient on an annual basis to cover 55 percent of the ferry's operating costs and authorized the County to increase ferry rates if revenue generated by ferry user fees fell below that percentage. Former WCC 10.34.030 (2005).

As will be discussed further below, the code defined and distinguished between "operating costs" and "capital costs." The code defined "Operating Cost"

---

[1] In April 2024, Whatcom County amended WCC 10.34 but maintained the same requirement that ferry user revenue must account for 55 percent of the system's operating costs. The parties do not dispute that the former code adopted in 2005 applies to this matter.

as "[a]ll actual daily running expenses and all actual regular and routine maintenance and administrative expenses associated with use and operation of all physical elements of the Ferry system." Former WCC 10.34.005(B) (2005).[2] And it defined "Capital Cost" as "[a]ll capital expenditures, including financing and depreciation expenses, applied to the replacement, expansion, or creation of Ferry System physical elements." Former WCC 10.34.005(C) (2005).[3] While operating costs can properly be included in the ferry fare box calculation, capital costs cannot. *See* Former WCC 34.005(D) (2005) (quoted above).

Two categories of expenses are at issue here: the lease payments and the dolphin expenses. Regarding the lease payments, the County entered a 35-year lease with the Lummi Nation in 2011 for the use of tidelands that extend from the mainland terminal at Gooseberry Point. The lease requires annual payments of $200,000. As to the dolphin expenses, the ferry system's infrastructure includes six "dolphins," which act as bumpers and help guide and stabilize the ferry during docking. In late December 2021, one of the dolphins sustained a "hard impact" with a ferry that necessitated repairs. In late 2022 and 2023, two dolphins, including the dolphin that was struck, underwent significant repairs.

---

[2] As amended shortly after Earle filed the current lawsuit, the code now expressly includes the lease payments as operating costs. The new provision defines "Total Operating Expenses [TOE]" as "all ferry system expenses that are not capital costs. TOE includes the vessel rental rate, all daily running expenses, all actual regular and routine maintenance, all [noncapital emergency repairs] expenses, and all administrative expenses associated with the use and operation of the ferry system. Consistent with past practice, the monthly tidelands lease or its replacement will continue to be considered part of the total operating expenses calculation at the value of its annual cash payments regardless of implementing the Governmental Accounting Standards Board's Statement No. 87 requiring lease accounting changes for financial reporting." WCC 10.34.005(F).
[3] This definition remains unchanged in the current code.

In April 2024, Whatcom County announced in an executive order its intent to increase ferry rates because ferry user fee revenue was insufficient to cover its mandated percentage of the ferry system's operating costs. Before the rate increases were scheduled to go into effect, Earle filed a complaint against the County, Satpal Sidhu (the County Executive), and Elizabeth Kosa (the Director of the Whatcom County Public Works Department). Earle sought to enjoin the County from implementing the ferry fare increases and requested a declaratory judgment that the County improperly classified both the lease payments and the dolphin expenses as operating costs for purposes of the ferry fare box calculation.

The trial court conducted a bench trial and considered both the deposition and live testimony of several individuals, including the Whatcom County Financial Director, a Public Works Department engineering manager, Kosa, Earle, and a certified public accountant who testified as an expert on Earle's behalf. At the conclusion of the trial, the court determined that the dolphin expenses were not attributable to regular and routine maintenance work and were therefore "inappropriately categorized" as operating costs. But the court rejected Earle's claim that the lease payments were improperly treated as operating costs rather than capital costs. That argument was based in large part on § 6.90 of the Whatcom County Home Rule Charter (hereinafter "section 6.90"), titled "Illegal Contracts," which provides:

> Except as otherwise provided by ordinance, any contract in excess of an appropriation shall be null and void; and any officer, agent, or employee of the County knowingly responsible shall be personally liable to anyone damaged by his action. The County Council when requested to do so by the County Executive may adopt an ordinance permitting the County to enter into contracts requiring

the payment of funds from appropriations of subsequent budget cycles, *but real property shall not be leased to the County for more than one year, unless it is included in a capital budget appropriation ordinance.*

(Emphasis added.) In rejecting Earle's argument, the court determined that section 6.90 did not govern the treatment of the lease payments for purposes of setting ferry fares. Accordingly, the court granted Earle's request for injunctive relief in part and enjoined the County from implementing the ferry fee increases until it removed the "disputed dolphin rebuild costs" from the "ferry fare box."

Earle timely appealed the trial court's ruling as to lease payments, and the County cross-appealed its ruling as to the dolphin expenses.

II

Turning first to Earle's appeal of the trial court's ruling regarding the lease payments, Earle argues the trial court erred when it denied his request for a declaratory judgment that the County improperly designated the lease payments as operating costs under WCC 10.34. The County argues the trial court erred in concluding that Earle has standing under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, to argue the County's treatment of the lease payments contravenes the capital budget appropriation ordinance requirement under section 6.90, and it also contests the merits of Earle's arguments. We address these issues in turn.

A

The UDJA governs requests for declaratory relief and incorporates justiciability principles of standing. RCW 7.24.010; *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001). Relevant here, standing refers to a

party's ability to "raise an issue regarding a legally protected right."  *In re Dep. of B.H.-W.*, 33 Wn. App. 2d 769, 777, 564 P.3d 1000 (2025).  This court applies a two-part test to determine standing under the UDJA.  "First, a party must be within the zone of interests to be protected or regulated by the statute in question.  Second, the party must have suffered an injury in fact."  *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 593, 192 P.3d 306 (2008) (internal quotation marks omitted).  Standing under the UDJA "is not intended to be a particularly high bar.  Instead, the doctrine serves to prevent a litigant from raising another's legal right."  *Wash. State House Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 712, 445 P.3d 533 (2019).  Standing is a legal question this court reviews de novo.  *Kanam v. Kmet*, 21 Wn. App. 2d 902, 909, 508 P.3d 1071 (2022).

In the trial court below, the County's standing argument focused entirely on whether Earle had standing to challenge its compliance with WCC 10.34, which governs the setting of ferry rates.  The County asserted Earle lacked standing because his alleged injury was merely a "general grievance," no different from other members of the public, and therefore not "individualized and particularized."  The trial court rejected that argument.  It concluded Earle had standing to challenge the County's application of WCC 10.34 because he and other Lummi Island residents are "necessary ferry rate payers" who are "uniquely beholden to the island ferry system" and the "primary beneficiaries of the zone of interests protected" by WCC 10.34.  The court also concluded Earle demonstrated "actual pecuniary harm" caused by the alleged misapplication of the code and increased ferry rates.  On appeal, the County appears to concede that Earle has standing

under WCC 10.34. Because the County does not challenge the trial court's findings and conclusion that Earle has standing to challenge the County's compliance with WCC 10.34, those findings and conclusions are verities on appeal. *See Fuller v. Emp. Sec. Dep't*, 52 Wn. App. 603, 605, 762 P.2d 367 (1988).

Instead of addressing the standing argument it presented below, the County argues Earle lacked standing to challenge the County's compliance with section 6.90. According to the County, section 6.90 was not designed or intended to protect residents from improperly calculated ferry rates. Instead, its purpose is to "protect the County from incurring unappropriated contractual expenses." Even assuming this argument was adequately preserved,[4] the argument is unavailing. Earle's complaint included a request for declaratory relief as to the County's (undisputed) violation of section 6.90 in failing to enact the required "capital budget appropriation ordinance." Earle argued the language of section 6.90 was a "binding mandate to Whatcom County to treat the cumulative and ongoing lease payments for the 35 year tidelands leased from the Lummi Nation as capital expenses." But Earle consistently maintained that he did not seek to enforce the Charter or nullify the tidelands lease, nor did he request an order directing the County to enact an appropriations ordinance. Instead, Earle argued that the necessary corollary of section 6.90 is the exclusion of lease payments from the ferry fare box as capital costs. Because Earle's claim was and remains premised on WCC 10.34, not section 6.90, the County's standing argument is misdirected.

---

[4] *See In re Recall of West*, 156 Wn.2d 244, 248, 126 P.3d 798 (2006) (standing may be addressed at any time).

In sum, the County does not challenge the trial court's findings and conclusion that Earle has standing to challenge the County's compliance with WCC 10.34, and the record does not support the premise of the County's current standing argument, which is that Earle's complaint seeks to enforce section 6.90. Accordingly, we reject the County's standing argument and now turn to the merits of Earle's appeal.

B

Earle argues the trial court erred when it denied his request for a declaratory judgment that the County's treatment of lease payments as operating costs violated WCC 10.34. Courts have the power to "declare rights, status and other legal relations" by declaratory judgment under the UDJA. RCW 7.24.010; *Lewis County v. State*, 178 Wn. App. 431, 436, 315 P.3d 550 (2013). Where, as here, an appellant seeks to reverse the trial court's legal conclusion, this court reviews the decision denying declaratory relief de novo. *To-Ro Trade Shows*, 144 Wn.2d at 410. As explained above, Earle challenges the inclusion of lease payments in the ferry fare box as "operating costs" based on his interpretation of section 6.90. Specifically, he relies on section 6.90's requirement that "real property shall not be leased to the County for more than one year unless it is included in a capital budget appropriation ordinance."

Relying on the definition of "operating cost," as set forth in Former WCC 10.34.005(B) (2005) (quoted in section I above), the trial court rejected Earle's argument regarding the meaning and effect of section 6.90 as follows:

> The Tideland lease is a reoccurring and repetitive fee, occurring at regular and expected intervals, for permission to use tribal land. As

such, it is a regular and routine expense for the ferry system as a whole. The failure to include this cost in a capital ordinance for its funding pursuant to the Home Rule Charter 6.9[0] does *not* invalidate the cost as a regular and routine expense or require its removal from the ferry fare box.

Earle argues the trial court erred in so holding.

Earle challenges only one aspect of the trial court's conclusion: its determination that failure to comply with section 6.90 did not establish error as to treatment of the lease payments as operating costs for purposes of WCC 10.34. According to Earle, this conclusion is wrong for the following reasons: (1) the language of section 6.90 is unambiguous; (2) the legislative purpose of section 6.90 is to "protect the county fisc from incurring unappropriated contractual expenses"; (3) section 6.90 requires multi-year leases to be "paid for as capital expenditures" so the lease payments cannot be treated as operating costs for any part of the County's budget; (4) the County admitted that the definition of operating costs excludes capital expenditures; (5) pursuant to Government Accounting Standards Board (GASB)[5] Statement No. 87, the County has treated the tidelands lease as a capital asset for accounting reporting purposes since 2022; and (6) treating lease payments as capital expenditures for all purposes is in line with the "consistency principle."

There are no disputes regarding section 6.90's mandatory language, the provision's purpose, or the County's failure to comply with the funding mechanism it prescribes. The only disagreement is about whether section 6.90 mandates the County's treatment of lease payments for purposes of the ferry fare box. Contrary

---

[5] According to the testimony below, the GASB is a Board that establishes rules for applying "generally accepted accounting principles" in a "governmental framework."

to Earle's argument, the Charter's mandate is limited to the enactment of a "capital budget appropriation ordinance." Nothing in the Charter's language dictates how the County must treat lease payments for accounting or other budget purposes. Accordingly, Earle's reliance on section 6.90 is misplaced—just as the trial court correctly ruled.

Nor does the evidence support Earle's claim that a "capital budget appropriation ordinance" is determinative, or even relevant, to the treatment of lease payments under WCC 10.34. The County's finance director testified that funds included in a capital budget appropriation ordinance may or may not be "capitalized" and can include operating expenses. He also testified that the County passed a capital budget appropriation ordinance related to a second lease agreement with the Lummi Nation, the "uplands lease," to allow the County to hold funds that would later be used to reimburse the tribe for road projects. Consistent with the County's argument and the trial court's analysis, the finance director explained that those segregated funds are not "capitalized" because the underlying projects are not the County's "capital investment."

The finance director further explained that it is the County's practice to use a "capital budget appropriation ordinance" when it needs to establish a "project-based budget," but funding through an appropriation ordinance, or a regular or project-based budget, does not determine whether the expenditure is a "capital item." The finance director also explained that the County's accounting treatment of the tidelands lease recently changed so that the lease is now listed as both an "asset" and a "liability" on the County's "balance sheet," but that accounting

- 10 -

practice is tied to a new GASB rule, not section 6.90. And while Earle's expert witness opined that the lease payments should be a capital expense, that opinion was primarily based on the expert's (apparently incomplete) understanding of the uplands lease payments, not the Charter.

In sum, neither the language of section 6.90 nor the evidence elicited at trial supports Earle's claim that section 6.90 requires the County to exclude the lease payments from the ferry fare box. Accordingly, the trial court did not err in denying Earle's request for declaratory relief on this issue.[6]

III

In its cross-appeal, the County challenges the trial court's ruling and order granting declaratory relief as to the treatment of the dolphin expenses under WCC 10.34. The County claims the evidence in the record does not support certain factual findings and, as a result, the trial court's findings do not support its conclusion that the dolphin expenses did not pertain to "regular and routine maintenance" and did not qualify as operating costs. We disagree.

---

[6] The argument in Earle's opening brief is limited to his interpretation of section 6.90 and its implication for WCC 10.34. In his reply brief, Earle also suggests the trial court erred because (1) the lease payments are not "daily running expenses," "regular and routine maintenance," or "administrative expenses" and (2) the court improperly construed WCC 10.34.005(B) by adding language that operating expenses include regular expenses for the "ferry system as a whole." We decline to address these arguments because they were not raised in Earle's opening brief. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration."). Nor have we considered the portions of the County's reply brief on cross-appeal that address the trial court's ruling regarding the lease payments (the issue raised by Earle's appeal) as opposed to the dolphin repair costs (the issue raised by the County's cross-appeal, which we address in section III below). As Earle correctly notes in his motion to strike those portions of the brief, the County is the respondent as to Earle's appeal of the trial court's ruling regarding the lease payments and the rules of appellate procedure do not authorize a respondent to file a reply. Accordingly, to the extent the County's reply brief on cross-appeal addresses the trial court's ruling regarding the lease payments, we have not considered those arguments.

"When the trial court has weighed the evidence in a bench trial, we review whether the court's findings of fact are supported by substantial evidence and, if so, whether the findings support the conclusions of law." *Rufin v. City of Seattle*, 199 Wn. App. 348, 354-55, 398 P.3d 1237 (2017). Substantial evidence is the amount of evidence sufficient to convince a rational, fair-minded person that a premise is true. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). "If that standard is satisfied, we will not substitute our judgment for that of the trial court even though we might have resolved disputed facts differently." *Green v. Normandy Park Riviera Sec. Cmty. Club, Inc.*, 137 Wn. App. 665, 689, 151 P.3d 1038 (2007). We review the record in the light most favorable to the party who prevailed below. *Jensen v. Lake Jane Estates*, 165 Wn. App. 100, 104, 267 P.3d 435 (2011). We review conclusions of law de novo. *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 792, 98 P.3d 1264 (2004). And we review mislabeled findings of fact or conclusions of law in accordance with what they are. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

The County challenges Finding of Fact (FOF) No. 8, which provides:

Following the ferry strike, significant repairs were performed in late 2022 and 2023 and involved the addition of 9 new steel piles to one dolphin and the replacement of 6 timber piles with steel piles (plus one additional new steel pile) to another dolphin. The addition of steel piles significantly exten[d]s the lifespan of the dolphins and such piles will be incorporated and used in any redesign of the ferry docking system. The funding for these repairs was authorized by an emergency proclamation. Per that proclamation, "a complete failure of the right midship dolphin is eminent."

The County also challenges various findings that are embedded in Conclusion of Law (COL) No. 5, which is partially based on FOF No. 8 and provides:

> Applying these [dictionary] definitions to the 2022-23 dolphin work done by Whatcom County, this Court concludes that that work was neither regular nor routine maintenance of the ferry system and was therefor[e] inappropriately categorized as an 'operating expense,' charged to the ferry fare box, and used to recalculate the fees Mr. Earle must pay. These expenses were irregular in two distinct ways. First, the expenses were necessitated by an unexpected and significant ferry strike which [led] to a risk of immediate failure of the midship dolphin. This work was an emergency response to that emergency situation. Second, the work was directed in clear recognition of the expected needs of a new ferry and will be used to benefit the same. A ferry replacement and necessary upgrades to the ferry system are not regular or routine maintenance.

In challenging these findings, the County points to evidence that only one of the repaired dolphins (the "most waterward/northern timber dolphin") was affected by a "significant" ferry impact and the work to address that incident was deemed "critical" but not an "emergency." And it points to evidence that only the repairs to the other dolphin (the "right midships dolphin") were authorized by an emergency proclamation.

The County is correct that FOF No. 8 and the factual findings embedded in COL No. 5 are inaccurate to the extent they suggest that repairs to *both* dolphins were (1) necessitated by a "strike" incident, (2) performed on an emergency basis, and (3) paid by means of emergency funding. Notably, the County contributed to the lack of specificity as to the two repairs. In its pretrial brief, the County represented that both repairs "were required due to ferry vessel striking one of the Dolphins so significantly that the Dolphin required more extensive repairs" and stated that the combined repairs were necessitated by the strike and funding was

- 13 -

"approved via emergency order." In any event, each of the court's findings is supported by substantial evidence in the record as to one of the repairs at issue. Neither party argued that the repairs should be treated differently because they arose out of different circumstances, were not equally urgent, or were funded by different means. And nothing suggests that the court's conclusion about the nature of the repairs was dependent on each circumstance being true as to both repairs. Thus, any purported inaccuracy in failing to specify that one dolphin was damaged by an unanticipated "strike" while the other was repaired with emergency funding because failure was imminent does not undermine the court's conclusion that both repairs did not constitute "regular and routine maintenance." WCC 10.34.005(B).[7]

The County also claims the evidence does not support the trial court's finding that the steel piles that were added to the dolphins "will be incorporated and used in any redesign of the ferry docking system." Likewise, the County asserts the evidence does not support the factual finding, incorporated in COL No. 5, that the repairs were "directed in clear recognition of the expected needs of a new ferry and will be used to benefit the same." In making this argument, the County points to the testimony of James Lee, the County's bridge and hydraulics engineering manager for the Department of Public Works. When asked if the new steel components would be used in a new ferry system, Lee said repurposing the steel piles had been "talked about" but would ultimately "depend" on the specifics of the new design. But in Lee's earlier deposition, which the court admitted as evidence, he agreed with the analysis of another County employee that the new

---

[7] *Cf. State v. Caldera*, 66 Wn. App. 548, 551, 832 P.2d 139 (1992) ("The trial court's erroneous finding does not materially affect the conclusions of law and therefore is harmless error.").

steel components had a "significantly longer expected lifespan" and would "likely be salvaged and incorporated into the new replacement dolphins" at a later date. Viewing the evidence in the light most favorable to Earle, as is required, substantial evidence supports the court's findings about the circumstances and funding of the repairs and the incorporation and reuse of added components in an anticipated new ferry system. These findings, in addition to unchallenged findings that the addition of steel piles "significantly expands the lifespan" and were "necessary upgrades" of the components, support the trial court's conclusion that the dolphin repairs were not "regular and routine maintenance."

The County next argues that the trial court erred by "failing to give appropriate deference" to its interpretation of WCC 10.34.005(B) in determining that the dolphin repairs amounted to routine maintenance. The County relies on a well-established principle of administrative law that agency interpretations of certain statutes or rules must be accorded deference if "(1) the particular agency is charged with the administration and enforcement of the statute, (2) the statute is ambiguous, and (3) the statute falls within the agency's special expertise." *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 716, 153 P.3d 846 (2007). The County claims WCC 10.34.005(B) is ambiguous because it does not address expenditures that are not capital costs but do not fit within the definition of operating costs. And the County asserts that properly characterizing the dolphin expenses requires knowledge of marine science and is a decision "best made [by] the people charged with overseeing maintenance of the ferry structures."

The foregoing arguments fail on multiple grounds. First, the County's argument contradicts its position at trial. During closing argument, when asked if the County was claiming its officials were entitled to deference, the County disclaimed this position and said it was making an "equitable" argument. Second, the County provides no authority that supports the argument that agency deference applies outside of judicial review under the Administrative Procedure Act, chapter 34.50 RCW. The case the County relies on, *Citizens for a Safe Neighborhood v City of Seattle,* 67 Wn. App. 436, 836 P.2d 235 (1992), involved judicial review of a city's administrative decision interpreting a zoning ordinance. The County fails to establish that agency deference was also required here or articulate why it should be treated as an agency with specialized "expertise." And third, even assuming deference was appropriate, the County fails to establish that WCC 10.34.005(B) is ambiguous. The County's contention that the applicable definition of "operating cost" is insufficiently inclusive is a claim of legislative omission or gap and not an ambiguity. We reject the County's arguments on cross-appeal.

IV

Finding no error, we affirm the trial court's declaratory judgment rulings.

_____
Feldman, J.

WE CONCUR:

_____, ACJ        _____
                                     Mann, J.

- 16 -